The next case on the docket, PAPA v. Department of Homeland Security, is submitted and will take up knife rights v. Bonta. Good morning, may it please the court, John Dillon appearing on behalf of Appellants. California's switchblade ban criminalizes the possession, carrying, selling, loaning, transferring, and gifting of a switchblade, a class of protected arms under the Second Amendment. The Supreme Court instructs us that a Second Amendment challenge begins with a threshold question, does the Second Amendment's plain text cover the appellant's conduct? Here that answer is simple and undisputed. The state has already conceded and the district court ruled that appellants are part of the under the Second Amendment, and the state does not dispute that the conduct here, possessing, carrying, selling, loaning, transferring, or gifting, constitutes arms-bearing conduct. The state also does not dispute that switchblades fall under Heller's broad definition of arms to include weapons of offense or armor of defense, and anything worn in defense or used to cast out or strike another. The Supreme Court has reiterated three times that the Second Amendment extends prima facie to all instruments that constitute bearable arms. Taken together, Heller, Bruin, Catano, and Rahimi confirm that an arm is presumptively protected by the Second Amendment's plain text, regardless of whether it is common, unusual, or otherwise. Because this threshold question has been favorably answered, the burden then shifts to the state to justify the ban based on reference to the nation's historical tradition of arms regulations. And in the case of arms bans, Heller already conducted the historical tradition analysis. The government can only ban an arm that is not in common use for lawful purposes, or in other words, the government may only ban arms that are both dangerous and unusual. The in common use and dangerous and unusual inquiries are two sides of the same historical coin. Are you making a facial challenge to the switchblade laws? Yes, Your Honor. Can I just ask, you characterized it as a ban. Is this really a ban? I mean, there are specific limitations on when you can possess or carry a switchblade. Yes, it is a functional ban, Your Honor. Why don't you explain that to me? I'd be glad to. The prohibitions under the California Penal Code sections prohibit carrying, buying, selling, loaning, transferring, or gifting a switchblade. So in that essence, any form of acquiring the switchblade is outlawed in California law. It also prohibits the possession in public in a car or vehicle. And it also creates the possession of a switchblade as a nuisance and subject to confiscation and destruction. Putting all these together, it amounts to a complete ban where there's no possible legal way to acquire these switchblades in California. If they allow you to purchase a switchblade from out of state, put it in the trunk of your car, and bring it home to your house, and then possess and carry it in your home, right? No, because just by transferring it in your car, you'd be violating the law as well as violating the nuisance ordinance. Why is that? Because it only bans the switchblade in certain places in the car, the driver's seat or the passenger's seat, not the trunk, right? Realistically, how do you get the knife in your car if it's not possessed outside of the car first? And I guess in the hypothetical that someone went out of state to purchase the knife, then placed the knife in their car before coming into the state, and then driving to their home and entering their home without getting out of the car, then it's possible that it would be illegal to possess and acquire that switchblade. However, I don't think that's realistically feasible. And in any case, there's already been at least one court that has prosecuted the possession of a switchblade within the home. So in the realistic fashion, there's no real way to acquire these switchblades in California without violating law in some fashion. So like I said, this is the in common use and dangerous than usual inquiry. I ask you, if this is a facial challenge, you agree that the government just has to show some constitutional applications. And do you agree that concealed carry, there's certainly a historical tradition of regulating concealed and prohibiting concealed carry? No, I wouldn't concede that, Your Honor. I don't see any argument in your briefs that the switchblade laws are invalid in all of their applications. We do argue that the switchblade law is invalid in every application. Okay, so then why don't you show me the historical evidence on concealed carry, please. The historical evidence regarding all weapons of concealed carry, Your Honor, just to clarify. Okay, I'm looking at prohibitions on concealed carry for New Jersey. It's daggers and dirks, Louisiana's knives, Kansas, Florida's everything except the common pocket knife, Tennessee, Virginia. You've got the Bowie knives evidence that everyone's been talking about. There are a lot of states that have prohibited concealed carry during the relevant time period. I would respectfully disagree with the relevant time period. The states that have imposed concealed carry restrictions on any type of knife, I'll summarize it in this fashion. During the colonial period, there's no ban on the possession of any kind of knife of any kind. Through the 1800s, there was one sales restriction in 1838 in Tennessee that prohibited the sales of Bowie knives, but it still allowed for the possession and carry of those knives. In 1881, there was another sales ban on Bowie knives in Arkansas, but that came well after 1870 and actually 1881. Now, the remaining concealed carry restrictions that were applied throughout the states, most every one of them was applied after 1870. They applied mainly to Bowie knives, although there were other types of knives that were described as fighting knives like Arkansas toothpicks. So in your view, there is no restriction, no regulation on switchblades that would ever be constitutional? That's what I'm hearing. With regard to concealed carry? Well, let's do both. In your view, is any regulation of a switchblade ever constitutional? Regulation may or may not be. I don't have a regulation in front of me, and we're not challenging a mere regulation. We're challenging an outright ban, Your Honor. But you're saying concealed carry you think is unconstitutional? A prohibition on concealed carry of a switchblade is unconstitutional. Is that your position? An outright prohibition on concealed carry. Again, this is something we can't take the prohibition in a whole, separate it out, and only apply concealed carry. It's a ban on all carry. Okay, but that's not my question. Is it your position that solely a concealed carry ban or switchblade knives is unconstitutional, nothing else, just concealed carry? Again, a switchblade ban solely on concealed carry would have to be justified by the government under the historical tradition that the arm is both dangerous and unusual or not in common use. And in your view, it could never meet that requirement, correct? I believe that under the historical analysis, both the Heller's common use and dangerous and unusual, and if you were to go and review all of the restrictions that were ever applied to knives in general, that there is no support for an outright ban, no. But you keep changing. I'm not saying outright ban. It's not an outright ban of concealed carry. But again, that's a hypothetical. Okay, so for you, no concealed carry ban would ever be constitutional because it can't meet the requirements. Again, the laws that were offered in support of concealed carry restrictions on bowing knives and other knives during the 1800s were the same laws that were offered in New York State Rifle and Pistol Association v. Bruin to support New York's proper cause or good cause requirement. The court in Bruin stated that these concealed carry restrictions were not sufficient evidence to support New York's ban through their proper cause requirement. As such, I don't think that those same restrictions would be supportive of an outright ban on switchblades as we have before us today and also an outright ban on concealed carry hypothetical that the court offers. What do you make, again on the ban question, what do you make of the fact that the switchblade regulations provide a procedure for confiscating and destroying switchblades in some circumstances but also provide for them to be returned to their lawful owners? That must mean that there are some people who are lawfully entitled to possess switchblades in California. Again, the record is completely devoid of a situation like that ever happening in the history of California. So, again, theoretically, it may be possible to come up with some legitimate means. However, applying the law as it's written, there's no means that would allow, no exception that would allow someone to get their switchblade back. I mean, in fact, transferring the switchblades is illegal per the penal code. So just the transfer of the switchblade back to the person would arguably be illegal under the law. Going back to the placement of the common use and dangerous and unusual test, I stated earlier that it's two sides of the same historical coin. The Heller Court read the Miller decision to hold as a matter of historical understanding that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes. And then it clarified that the historical basis of the common use limitation recognized in Miller is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons. In other words, all bearable weapons are arms covered by the plain text of the Second Amendment and thus presumptively protected. And the nation's historical tradition does not necessarily protect arms that are not typically possessed by law-abiding citizens for lawful purposes. And the Bruin Court subsequently reaffirmed this decision in Heller that the Second Amendment protects the possession and use of weapons that are in common use at the time. Thus, the in common use and dangerous and unusual analysis is firmly rooted in the historical tradition. Do you think that's one test in common use for self-defense and dangerous and unusual? Yes, Your Honor. Like I said, it's two sides of the same coin. So it's two ways of looking at… And where would you apply that? Would you apply that in Bruin Step 1 or Bruin Step 2? Yeah, I stated this would be applied in Bruin Step 2 historical analysis. Okay. Because what if we were to think it should be the in common use for self-defense should be considered as part of Bruin Step 1 as to whether or not it's a protected arm in the first place? As I stated earlier, Heller Court has stated that the in common use analysis is firmly rooted and supported by the historical tradition of banning those weapons that are both dangerous and unusual. Now, with regard to the… But didn't Bruin itself assess at its first step, not the second step, whether handguns were in common use for self-defense? Yeah. Bruin did have a statement that said it is undisputed that handguns are commonly used for self-defense. But what that statement did was conclude in summary fashion that there was nothing in the historical phase of the inquiry that would have defeated plaintiffs' claims based on who they were or what weapon they wanted to carry. Let me ask you then. What evidence do you have that switchblades are in common use today for self-defense? Again, because the common use analysis puts the burden on the state, it is the state's burden to show that they're not in common use or both dangerous and unusual. However, we did provide the only evidence in the record regarding commonality. So appellants stated and showed through our record evidence that they're numerically common as they're lawfully owned by millions of Americans and sold in thousands of varieties across major retailers. We've showed that they're jurisdictionally common. Is that consistent with McDonald's statement that, you know, states have the right to devise their own solutions to social problems that meet their own local needs and values? Yeah. States do have the ability to enforce their own regulations. However, just like all other constitutional rights, there is a minimum standard, a nationwide standard that the Second Amendment imposes on all states that every state must meet, and that is to prevent any type of outlier. So when Heller considered D.C.'s ban on handguns, they stated that handguns are a product of the people nationally. They considered their lawful use nationally. They didn't consider the common use of handguns in D.C. At that point, D.C. had already banned handguns for a number of years. So there would be no common use of handguns in D.C. So applying a common use standard relegated to only the state issuing the ban would not be consistent with Heller. On the flip side, Heller- But aren't you doing the same thing? You're saying here are jurisdictions that allow it, and haven't we basically rejected that numerosity approach to showing common use? Well, Duncan rejected the numerosity, and it focused its rejection based off the fact that the magazines in question, they described them as accessories. They weren't firearms, according to the court in Duncan. And because of that, they were not going to base the popularity of that non-firearm accessory, and give it any constitutional merit. I would argue, however, that Heller and Bruin have both demanded that that is the test to be applied. The common use-in common use, or in other words, saying not both dangerous and unusual. If something is common, it cannot be unusual, and therefore it's protected. Didn't we already hold in U.S. versus Alanese that the in common use test falls under Bruin's first step? Respectfully, no. Alanese wrote down one sentence when it summarized the threshold textual analysis being in the first, the common use test being in the threshold textual analysis, but it explicitly stated that it was not deciding that, and that it would assume step one threshold analysis in that case. Duncan came after and affirmed, while it affirmed that Alanese was good law, it also stated that there was no consensus in the Ninth Circuit with regard to where in common use, dangerous and unusual applies, whether it's the threshold inquiry or the historical justification. And it also went on to address the appellant's commonality argument under the historical analysis. So again, I'll go back to the commonality here. We've shown that they're numerically common, jurisdictionally common, and categorically common, as they're no different from any other folding pocket knife that are legal to purchase, own, carry, and possess in nearly every state in this country. These are pocket knives, and the state has, you know, their experts have described them as such. Well, they have a specific definition in the statute as to what a switchblade is. Yeah, and even in that definition, it describes them as a knife with the appearance of a pocket knife. And under any definition... But they have this spring feature or something. Yeah, but under any definition of pocket knife, a switchblade falls under that. It is a knife that folds where the blade is encosed in the handle of the knife, and it is carried in the pocket. So going back... It includes a pocket knife, but includes a spring blade knife, snap blade knife, gravity knife, or any other similar type knife. So it's distinct from a regular pocket knife. It's distinct in the sense that it has an extra spring, but the function... Which is what the feature is. That's the feature that makes it particularly dangerous in the eyes of California. Honestly, they've never actually argued that the spring itself makes the knife more lethal or dangerous. In fact... But they don't regulate... The state does not regulate pocket knives in the manner in which it regulates switchblades. Yeah. You concede that? Regular pocket knives are not... Folding manual or assisted opening pocket knives are not prohibited under California law, yes. Counsel, if I could ask you a question on that point. Why is it not true that a switchblade knife, whether opened to show the blade on a push of a button... Or one based on gravity that comes with a flick of the wrist... Why isn't that more dangerous than a normal pocket knife? Because the blade can be deployed almost instantaneously. It gives no warning to a person who might be attacked. Yes. Appellants have shown in the record that the speed of opening a switchblade is no different... Than the speed of opening an assisted opening blade or assisted opening knife that is legal in California. We have a video demonstration showing switchblade versus assisted opening. They open at the same time. In fact, the speed of opening has never been argued by the state on this record... That that is what makes it more lethal or dangerous in any way. The state argues that these arms are not, quote, suitable for self-defense. And in support of that claim, they offer expert testimony... Who quite literally just expressed his opinion that he prefers to use a fixed blade knife... As opposed to a switchblade knife in self-defense. His critiques of switchblades don't ever claim that a switchblade is more dangerous to the public or dangerous to the public at large. There's no claim that there's any type of uniquely dangerous feature of a switchblade knife that causes devastating harm. There's no claim or evidence that switchblades are particularly capable of unprecedented lethality. There's no evidence or claim that switchblades pose exceptional dangers to innocent civilians. The state's own expert admits that switchblades are not any public threat. There's also no claim or evidence that switchblades are associated with mass casualty events. No evidence or claim that switchblades facilitate criminal violence at higher rates. There's no data suggesting that they are disproportionately used in crime. And there's no claim or evidence that a switchblade has ever even been used in a crime in California in this record. Let me ask you. You said manual knives and regular pocket knives are not covered by this switchblade law. Do you agree? What about manual switchblades? Respectfully, Your Honor, there is no such thing as a manual switchblade. Okay. You don't think they exist? They factually do not exist. The reason a switchblade is defined as a switchblade is because it opens with the push of a button with the added spring. A manual switchblade, if I am interpreting the court correctly, would mean that you have to manually open the knife. That would just fall under the general definition of manually opening, folding pocket knife. Okay. So folding knife, you agree, is not covered? By this prohibition, no. Generally, folding knife. Swiss Army utility knife, not covered? No. Okay. So by any type of mechanism whatsoever, you understand that to mean like a spring. That's the language from the definition of switchblade knife from Penal Code 17-235. Yes, the addition to a spring when it comes to switchblade knives, but switchblade knives also include the definitions of gravity knives and what are commonly referred to as butterfly knives as well under the definition. So it prohibits all of those. A gravity knife or a butterfly knife doesn't have an extra spring, but they're still regulated as switchblades and prohibited under California law. And notably, the butterfly knives, the ban on butterfly knives was ruled unconstitutional in Teeter. However, that was vacated. Is this switchblade knife suitable for use in self-defense? Yes, Your Honor. The state's expert admitted that switchblades can be used for self-defense and even any weapon can be used in self-defense. Again, the text of the Second Amendment, Heller defined to keep and to bear when he was addressing what was meant in the scope of the Second Amendment. To keep, the court defined as to have a weapon or to retain possession of. To bear meant the practice of carrying a weapon to be ready and in case of conflict with another person. Both of these textual definitions under the Second Amendment's text define or necessarily require that mere possession is all that's required under the textual threshold to be covered by the Second Amendment. The requirement that the state offers that we have to show that they're commonly used in actual self-defense scenarios is just not there and it's never been required by the Supreme Court. In Heller, the court never required that the plaintiff's or appellant's challenge offer proof of how many times handguns were ever used in self-defense. It was assumed common. Also in Catano, stun guns, it was never considered how often they were used in self-defense. It was the fact that they were merely possessed for the purpose of self-defense and other lawful purposes that allowed them to be protected under the plain text of the Second Amendment. I'd like to also point the court to the fact when we're discussing the placement of the threshold, I know the state and the court has mentioned the Alaniz and Duncan case. I'd also like to point the court to the U.S. v. Perez-Garcia. In that discussion of Bruin's application of the historical record, Perez-Garcia references the in common use and dangerous and unusual standard as part of Bruin's historical tradition analysis at least two separate times. The references are at 96 F. 4th, 1166, pages 1177 and 1191. There, the Perez-Garcia court treated dangerous and unusual as part of rebutting the presumptive protection of the Second Amendment or as part of the so-called step two historical analysis. Okay, counsel, you're well over your time. We've been peppering you with questions, so I've let you go because of that. May I still get some time for a rebuttal? Yes, you get a couple of minutes. Good afternoon and may it please the court. Katrina Uehara for the California Attorney General. California's longstanding restriction on switchblade knives addresses only the most dangerous of those knives, those with blades two inches or longer and that do not have a safety mechanism. The district court correctly held that plaintiffs failed to satisfy their burden at Bruin's threshold stage because they failed to prove that the subset of knives at issue are in common use for self-defense. Can I ask you, there's a lot of language in Heller and Donald and even in the Ninth Circuit case FIOC that it has to be possessed for lawful purposes. And in some instances I agree they say like self-defense or most notably for self-defense, but why should the common use be limited to self-defense rather than lawful purposes? Your Honor, so we certainly do get the for lawful purposes language from cases like Heller and cases that specifically predate the Bruin framework. Bruin itself though uses the phrase in common use for self-defense. And when Bruin uses that language, it uses it at the first step of the textual analysis before it finds that the petitioners in that case, that their claim was presumptively protected under the Second Amendment. And I think a finding that, or sorry. But you know, I'll say, you know, we have this Ninth Circuit case that says commonly possessed by law-abiding citizens for lawful purposes. That's FIOC v. Sunnyvale. Is that no longer a good law then? Your Honor. Are you asking us to? So we don't think this court needs to overrule FIOC versus Sunnyvale. And we think FIOC is actually particularly helpful because when we're also discussing the dangerous and unusual analysis, FIOC actually puts dangerous and unusual at the first step of the Bruin framework. Now, but returning back to common use, Your Honor, not only does Bruin place in common use for self-defense at the first step of the analysis, this court's precedent in United States v. Alanis, which Judge Wardlaw referred to, also placed common use at the first step of the analysis. And when it does, it uses the phrase in common use for self-defense. And that finding that common use is at the step one of the inquiry and that it's for whether or not an arm is in common use for self-defense, this is consistent with other circuits as well. There are five other circuits to address this issue, and they've all put common use at the first step of the analysis. And similarly, the circuits who have addressed whether or not common use is for lawful purposes as opposed to for self-defense. Let me ask you, why does common use require showing the weapon was actually used in a specific incident for self-defense? Because you have all this language about, you know, the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens, right to possess and carry weapons in case of confrontation. None of those actually say you have to actually have used it in self-defense or need evidence that it was actually used in self-defense. I think we get the requirement that this weapon needs to be actually used for self-defense from that language, whether or not a weapon is in common use for self-defense. Now, I think in Heller and in Bruin, in some ways, the Supreme Court has had it easy. But they say possessed. I mean, if you look at FIOC, if you look at Heller, they say possessed. They don't – I mean, I agree with a lot of these cases. There's a lot of different language. But they clearly do say possessed for lawful purposes and not just used. I understand Your Honor's concern with the varying language that the Supreme Court has used to describe this. But I think Bruin really just sets the rule for us, and that's in common use for lawful self-defense. And the easiest way to show that is to show that this weapon has actually been used for lawful self-defense and that it's useful for self-defense. And that language that requires a weapon to be useful for self-defense, we also get that analysis from Heller. Heller spends pages discussing why handguns are the quintessential self-defense weapon. And our usefulness analysis is an extension of that. And what's the time period of that actual use in self-defense? What's the time period that you have to show that? That's a great question, Your Honor. I don't think courts have identified. I think they've used the word today.  Commonly used in self-defense today. Yes. There's certainly also language that says in common use for self-defense today. And is there evidence in the record on that as to switchblades? Your Honor, I just heard from my colleague a moment ago, who just pointed out that the only evidence in this record of common use for self-defense are sales figures and ownership statistics that point to the number of switchblades in circulation. And as Judge Cole alluded to, we know that's simply not the test for common use. And Duncan expressly rejects that test for common use. Duncan and other opinions in the circuit have noted that a numerical numbers only approach to common use is circular at the end of the day. It suggests that the state may only restrict a particular weapon at the beginning of its use when numbers in circulation are low. And that actually runs counter to our nation's history of firearm restrictions. And the sales figures that plaintiffs do provide have nothing to do with the particular subset of switchblade knives at issue in this case here. They're about switchblade knives generally. And most of all, that evidence tells us nothing about whether or not the subset of knives at issue in this case are in common use for self-defense. And if they're not, then they would not be protected by the Second Amendment? That's correct. They're not presumptively protected under the Second Amendment. I think Judge Gould had a question, or has a question. I think I was just coughing. Oh, okay. Sorry. Can you address In Re SC? I'm sorry, which case is that, Your Honor? That is the California Court of Appeal case that said that these laws apply to possession of the home, actually in someone's pants pocket. Yes, Your Honor, and that is a old case. We don't have too much on it. That's still good law, correct? It's not been vacated? Not to my knowledge, Your Honor. Okay. And so sort of returning back to the common use test here, plaintiffs push two other versions of common use that they believe this Court should adopt. They first endorse a categorical approach to common use, and that's where they suggest that because the broader category of folding pocket knives are common, that they must be in common use for lawful self-defense. But we just heard a moment ago that plaintiff conceded that folding pocket knives is a broader category, and switchblades certainly fall in that, but folding pocket knives are perfectly legal to own in California. California restricts only knives that have very specific characteristics, and those are ones with blades two inches or longer and don't have a safety mechanism. And so there's a whole host of other knives, folding knives, switchblades. I guess my concern about the definition, it says that it basically releases by any type of mechanism whatsoever, which seems kind of broad. It says released by the weight of the blade. I mean, that seems like that could potentially include manual opening, if you're doing it by the weight of the blade. Certainly, Your Honor, and maybe by the push of a finger or something like that. I think part of the reason the statute is so broad is the statute was passed 68 years ago, right when these knives were starting to circulate in public consciousness. And so it's a broad definition that's meant to encompass the different varying versions of switchblade knives. And we'll turn to our analogs in a moment, but we see the same concern in our historical analogs, where the laws define the different types of historical impact weapons quite broadly to make sure that they encompass all those different versions and sort of the newest, latest, and greatest versions of those weapons. And, Your Honor, I also want to address plaintiff's jurisdictional approach to common use, that because switchblades are legal in different jurisdictions, that must mean that they're legal here. And on this issue, we simply agree with the district court. Other jurisdictions' laws are irrelevant, and they have no bearing on whether or not the regulated situation- Could you address some of your arguments for why switchblades don't have the character of self-defense, seem like they apply to handguns, like you need training, you could accidentally shoot or harm yourself, there's a psychological barrier to using it, safety issues. Tell me why they don't have the character of a self-defense weapon. Certainly, Your Honor. And I want to first start by saying that this is not an issue for which we bear the burden. It's plaintiff's burden to show that these are in common use and are useful for self-defense. But all of this is to say that our expert concluded that most people would not be able to use a switchblade effectively for self-defense. And there's a few things that get specifically to knives in general, specifically that in a high generalized close combat scenario, which is with a handgun, you can shoot from a distance, of course, that you would require the slashing and targeting of specific nerves and specific ligaments for that knife to be effective for self-defense. And that makes it quite different. The training is quite extensive. And our self-defense expert also speaks to... Do you think that the switchblades are deadly weapons? Oh, yes, Your Honor. And why is that? They're deadly and lethal weapons very consistent with our historical analyze. You know, when the Knife Circuit was discussing Bowie knives, the Knife Circuit made the observation that those knives had long, thin blades and that made them less useful for self-defense. And here we contend that these knives with blades that are 2 inches or longer are also similarly dangerous. Can I ask you about the historical analogs? So it seems like we have to mix and match them. We have to look at the ones for carry. We have to look at the ones for possession. We have to look at the ones for sale. We have to look at the ones for forfeiture, surrender. Is there any precedent for doing that kind of combination of analogs? Your Honor, so our historical laws certainly address kind of a statutory regime. There's many different ways that these historical impact weapons were regulated. But I think the best precedent for this court to turn to is Rahimi. So Rahimi instructs us to consider, quote, and is consistent with the principles that underpin our regulatory tradition, end quote. And we think that's certainly the case here. Rahimi itself relied on surety laws and prohibitions on going armed in public. And the court recognized in Rahimi that those laws were by no means identical to the federal domestic violence restraining order prohibition. And, you know, the court doubled down that those laws didn't need to be identical because that federal prohibition fit neatly within the tradition that the surety and going armed laws represent. So I don't think your Honors need to get too caught up on what the specifics of each law specifically did. It's important that this court look to the underpinnings and the general principle. And here we argue that California's restrictions have effectively the same sort of why as the historical analogs. And the overarching tradition that we identify is our nation's historical tradition of regulating dangerous and deadly impact weapons that are susceptible to criminal misuse. And so here, like our historical analogs, the switchblade knife saw an influx of these. Let me ask you, in Bruin they said three colonial historical analogs. They doubted whether that would be enough. And for sale, we really just have two, Tennessee and Arkansas. And they're not from the colonial period. They're from 1881, 1838. Why should those be enough? Well, your Honor, that's only the case if we're looking specifically at bowie knife restrictions. You know, we have analogs that range much further, specifically when you look at some of the older impact weapons like clubs, like bludgeon. Some of those laws go back quite a bit earlier. I think our earliest law is from 1788. And I think rather than focus on the bowie knife, which is the one bladed knife in our tradition. But you would agree, let's say you go to 17, I can't recall what year you said. I mean knives were not necessarily treated the same at that time as a club, were they? Certainly not, Your Honor, but they were impact weapons with concerns about concealability, and they were closely associated with criminal use. And that's why the switchblade joins this line of other historical impact weapons that had these dangerous propensities and then were targeted by legislatures. And so the switchblade knife in particular saw an influx of use when young soldiers were returning from World War II. And with them, when they came back home from Europe, they brought those knives with them. Do you know why that was? I know the regulations are recent, but do we know why that was when they became more common? That's a great question. I think the earliest versions of switchblades actually go back to Italy and go back to Europe. And so when they were in service in World War II in those different countries, that's I think when those knives came to the United States. And so once those knives came back to the United States, they became quickly associated with juvenile crime. And as a result, California and many other states stepped in to restrict them. I believe it's a total of 20 states that restricted them before the federal government did a few years later. So do we need to get to Bruin Step 2 in this case? Your Honor, no. We believe at Step 1, this court can simply affirm the district court's judgment because plaintiffs haven't provided evidence that the subset of knives at issue are in common use for self-defense. Can I ask you, let's go back to NRA SC because that does give me some pause. Section B of the statute just prohibits every person who carries the switchblade knife upon the person. Yes, Your Honor. Where do you see that the home is excluded? We don't, Your Honor. I think NRA C is a very strange case. And I think when we look at these- Wait, so you're agreeing that in the home is prohibited then? If you're saying you don't see any way to exclude in the home- No, so- The language is every person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor. A, possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public. B, carries the knife upon the person. C, sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person. I don't see how the home is excluded there. Yes, Your Honor. You agree? That is certainly our position. So the home, if you carry the knife upon your person in your home, you will have been committing a misdemeanor in this case? No, Your Honor. We think these knives, you are able to possess them. In the home, but where in the statute does it say that? Because I don't see that in the language. It doesn't say that explicitly, Your Honor. But Section B, carries the knife upon the person, we take that to be open and concealed carry outside of the home. Wow, where do you see that language? Carries the knife upon the person? Yes, in subsection B. No, but I'm saying where do you see except when you're outside in the public? Where is that? I think that's implied by the fact of the nature that it's a carry restriction, and the fact that home isn't explicitly mentioned here.  There are public carry and concealed carry restrictions. Why is that understood, that that's a public carry restriction? Your Honor, that's our understanding interpretation of this statute, and I think Your Honor is getting to attention in this statute generally, and you see this both in the definition and in the actual 21-510 section, which is that this law was written 68 years ago, and they were trying to get every conceivable version of this type of knife, which was still developing, and they were primarily used in juvenile crime. It was a fighting knife, offensive knife. And so I think in Sections A, B, and C, the legislature was specifically targeting that use by juveniles, and those fights were happening supposedly and allegedly on the streets. And Your Honor, now if I could return back quickly to our historical analogs. I think it's important to underline why this court doesn't need to look only to Bowie knife restrictions. So all of our analogs, and many of them were credited in Duncan. It's not just the Bowie knife restrictions. We also have restrictions on clubs, bludgeons, slingshots, sandbags, and many of those are also mentioned by name in the Duncan opinion. And all of those analogs have one thing in common, and that's that they were the choice of criminals, and that they were impact weapons that were deadly and lethal and could do so silently. And only after those weapons began to proliferate in crime and in use did legislatures turn to restrict them. Now, Your Honors, this is in many ways a straightforward case. At Step 1, plaintiffs simply haven't met their burden of establishing that the subset of knives at issue are in common use for self-defense. They conceded as much that all they present is sales estimates and ownership statistics. They don't provide this court with a single instance of those knives being used for self-defense or show that they're particularly useful for self-defense. On that issue alone, this court can and should affirm the district court's ruling. But even if this court chooses to proceed to Step 2... What should we make of the Supreme Court of Georgia saying that banning the possession, carrying, and sale of Bowie knives was inconsistent with the Second Amendment and only allowing the concealed carry portion to be upheld? What should we make of that? Your Honors gets to sort of attention with these laws, and it's something that Justice Barrett and Justice Sotomayor have discussed kind of in detail in the Rahimi concurrences, which is that historical analogs are helpful to the extent that we find an underlying historical principle that helps us tell if today's law is consistent with that tradition. But historical laws also don't necessarily tell us where the constitutional floor or ceiling is. And this case is about that, right? And so even if this court does choose to proceed to Step 2, and whether that's by finding that the particular knives are arms or simply by out of an abundance of caution moves to Step 2, the state has met its burden of establishing that California's switchblade restrictions is consistent with the nation's history and tradition of regulating particularly dangerous and deadly impact weapons that are susceptible to criminal misuse. Thank you. Thank you, counsel. You can have a couple minutes. Thank you. I'll try to keep under the time this time. So first, addressing the state's claim that Bruin put this firmly in the threshold analysis, I want to go back to that comment, the one-sentence claim under Bruin. It's our position that Bruin was literally just disposing of an issue that was not in dispute in the case of Bruin, and this is evidence from the court's final sentence in that relevant passage. We therefore turn to whether the plain text of the Second Amendment protects the plaintiff's proposed course of conduct, carrying handguns publicly for self-defense. Far from implying that the in common use test applies at the threshold plain text phase of the inquiry, Bruin refutes the very argument. The court resolved entirely the question of whether the arma issue in that case were protected by the Second Amendment, not just presumptively protected under the plain text. Bruin does not say that handguns are prima facie covered by the Second Amendment as a matter of plain text. It says that they are protected, period. And the conclusion is only possible because the Bruin court resolved the issue conclusively with respect to text and history. So Bruin did not put in common use in the textual analysis. Second, the state claims that California only bans knives or blades with two inches or longer and don't have a safety mechanism. But we know that that's not true because there are many manual knives that are over two inches with a blade length and don't have a safety mechanism in the blade. So it specifically goes after switch blades that are the standard. Under two inches, the only really reason that switch blades exist under two inches is in order to comply with the law, and I'd also argue that switch blades are not defined as a knife with a blade less than two inches is not defined as a switch blade under the law. Also, with regard to suitability, Heller already talked about all the many reasons why a civilian may prefer a handgun in home defense, and then explicitly stated, whatever the reason, handguns are the most popular weapon chosen by the Americans for self-defense in the home, and a complete prohibition of their use is invalid. That was at page 629. So it dismissed all of these suitability reasons for training, what the expert believes is the best use. With regard, if we were to apply this, then bolt-action rifles, lever-action rifles, many shotguns would not be protected under the plain text of the Second Amendment because they're not commonly used in self-defense, and that just would completely flip the Second Amendment over. So hunting weapons would not be commonly used in self-defense? Yeah, so weapons that have been unanimously and universally accepted as protected by the Second Amendment wouldn't be protected because they're not commonly used in self-defense, and that just doesn't work with the precedent that we have. All right, very interesting. Thank you. Thank you both for your excellent argument. I also want to thank all the entities that submitted amicus briefs to assist us in this analysis, including Everytown Law, and a brief written by Bill Taylor, and the brief by Clement and Murphy, written by Erin Murphy. Thank you very much for your helpful writings, briefings in this case. And Knife Rights v. Bonta will be submitted, and this session of the Court is adjourned for today.
judges: WARDLAW, GOULD, KOH